IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:25-CR-66-KAC-JEM |
| | ) | |
| PATRICK WARREN HEBERT, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This case is before the undersigned for report and recommendation on Defendant Patrick Warren Hebert's Motion to Suppress as Evidence the Contents of a Suitcase Seized and Searched on December 13, 2024 ("Motion to Suppress") [Doc. 22]. *See* 28 U.S.C. § 636(b). The Indictment charges Defendant with one count of possession with intent to distribute fifty grams or more of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) [Doc. 3 p. 1]. This charge arises out of the stop of a vehicle driven by Defendant on December 12, 2024 [Doc. 22]. Defendant moves to suppress all evidence discovered in a search of a suitcase following a traffic stop [*Id.* at 1].[1] After reviewing the evidence, the arguments of the parties, and the relevant law, the undersigned finds that the officers properly conducted an inventory search of Defendant's vehicle, during which they found methamphetamine and cash, and that the suitcase was searched pursuant to an unchallenged warrant. The undersigned therefore recommends the District Judge **DENY** Defendant's suppression motion [Doc. 22].

---

[1] Defendant filed the Motion to Suppress on March 27, 2026, after the September 3, 2025 deadline to file pretrial motions [Doc. 9 p. 1]. The Court granted leave for Defendant to file the late motion after Defendant explained that the late suppression motion was due to unsuccessful attempts to receive audio/video recordings of his arrest [Doc. 27 p. 2].

## I.    SUMMARY OF THE EVIDENCE

The parties appeared before the undersigned on June 2, 2026, for an evidentiary hearing on Defendant's Motion to Suppress [Doc. 31, Minutes]. Assistant United States Attorney Michael Gilmore appeared on behalf of the Government. Assistant Federal Defender Nakeisha Jackson appeared on behalf of Defendant, who was also present.

The Government presented the testimony of Anderson County Sheriff's Office ("ACSO") Deputy Devin Michael Corn, who testified that he has worked as an ACSO patrol deputy for four years. He explained that to become an ACSO deputy, one must attend a training academy, as well as an in-house program during which he was assigned a senior officer who mentored him over the course of three months. On December 12, 2024,[2] he was on patrol and had been working for ACSO for a little over two years. Deputy Corn conducted a traffic stop on Defendant for failure to maintain lane, which he testified was a violation that could result in a traffic ticket. Deputy Corn stated that after Defendant found a safe place to pull over, Deputy Corn began his dialogue with Defendant; at that time, he noticed Defendant's vehicle was in disarray and Defendant seemed nervous. Deputy Corn asked for Defendant's license and testified that Defendant did not provide his license but did give his name. Deputy Corn provided Defendant's name to dispatch, who advised that Defendant had an extraditable warrant from Arkansas. Deputy Corn explained that meant the State of Arkansas wanted the individual to be taken into custody. Deputy Corn arrested Defendant and placed him in the back of his patrol car.

---

[2]    There is a discrepancy between the date Defendant states the search occurred in his Motion to Suppress, December 13, 2024, and the date that Deputy Corn testified the search took place, December 12, 2024. Because the date reflected on the ACSO's Incident Report is December 12, 2024, the Court finds that the search occurred on December 12, 2024 [Doc. 29-1 p. 2].

Deputy Corn further described Defendant's vehicle and stated that there were items scattered throughout the vehicle, including trash, and that it appeared unorganized. Deputy Corn testified that per ACSO's policy regarding vehicle impoundment and towing (ACSO General Order), he gave Defendant the opportunity to call someone to retrieve his vehicle, but that Defendant was unable to contact anyone. Deputy Corn stated they both used their respective cell phones in an attempt to contact Defendant's friend. Deputy Corn testified that the area was rural and that it was hard to get cellular service.

Deputy Corn explained that per ACSO's policy, if the arrested individual is unable to make arrangements with someone to retrieve the vehicle, then they are to tow the vehicle to a lot. He explained this is done for multiple reasons, including liability to prevent things from being stolen, and to protect the items inside the vehicle. After Defendant was in custody and he was unable to get in touch with someone to get the vehicle, Deputy Corn testified that he began to inventory the vehicle, beginning with the driver's side of the vehicle. Deputy Corn stated there was cash, including one hundred dollar bills, all over the car, including in the side of the door, on the floor, and in the center console. Deputy Corn maintained that he was not investigating a crime at this point and was only inventorying the vehicle. Deputy Corn stated that he found pillowcases and as he was moving them to inventory other items, there was some stuffing that had been pulled out of a pillowcase and he felt a hard object inside, which he later confirmed to be a Mason jar. He testified that there appeared to be methamphetamine inside the jar. Deputy Corn said this jar was not inside the suitcase nor in any type of locked container, and that at no point did he open a locked compartment or suitcase in this vehicle. After finding the methamphetamine, Deputy Corn testified that he contacted the Seventh Judicial Task Force due to the amount of methamphetamine found within the vehicle. Deputy Corn confirmed that at this time he himself was not a part of a narcotics

3

division. The Seventh Judicial Task Force arrived at the scene and took possession of the vehicle, as well as the methamphetamine and the cash. Deputy Corn testified that he did not finish the inventory of the vehicle and instead transported Defendant to jail.

Deputy Corn explained that he did not issue a traffic ticket for Defendant that day because he was giving Defendant a break. Deputy Corn stated that he completed a report of the traffic stop. He agreed that the report was short and testified that, after having more years of experience in law enforcement, the report should have been more detailed. He said that everything in the report was true and accurate. Deputy Corn testified that on December 12, 2024, he did not have a dash camera or a body camera because ACSO did not provide them and that he was not part of the decision not to include them. Deputy Corn agreed that when he conducted the inventory of the vehicle he believed he was complying with ACSO's procedures.

The Government showed Deputy Corn a photograph of the items found in the vehicle [Doc. 29-3]. Deputy Corn testified that he took the photograph and that it was an accurate depiction of the methamphetamine and some of the cash that he had found. Deputy Corn stated that the picture also depicted small baggies with red lines that are typically used to package drugs for resale. He confirmed that this was the only photograph he took that day. He stated that he was not aware of, or a part of, the subsequent search warrant executed in July.

On cross-examination, Deputy Corn testified that he believed the date of the traffic stop was December 12, 2024. He stated he was on routine patrol that day and was traveling down Briceville Highway. Deputy Corn agreed that, at that time, the highway was not heavily populated. Deputy Corn confirmed that the vehicle he saw was traveling down the center of the road and that he had to very slightly maneuver around the vehicle to avoid being hit. He stated that he made a U-turn, activated his blue lights, and pulled over the vehicle. Deputy Corn testified that the driver

identified himself as Defendant, that no one else was in the vehicle, and that he called dispatch and received a return for a warrant that was extraditable outside of Tennessee. He then placed Defendant under arrest and placed Defendant in the back of his cruiser.

Deputy Corn testified that he has been trained to be detailed and include all the relevant information when writing a report. Deputy Corn agreed that the incident report could be supplemented at a later date and that it is submitted to a supervisor after it has been completed. He testified that he has not made any revisions to the report he wrote for the incident in question. Deputy Corn confirmed that the interaction between him and Defendant was not recorded. To his knowledge, Deputy Corn stated that none of the other officers on the scene wore cameras.

Deputy Corn affirmed that he was familiar with the ACSO's General Order and that he had to abide by that order for his employment. He agreed that it contained guidelines on towing procedures and that section five discussed what to do when a driver is arrested. Deputy Corn agreed that the section stated that the driver was entitled to make their own arrangements for the custody of their vehicle depending on the location and circumstances of the arrest.

As for the location of the arrest, Deputy Corn testified that they were parked in the Walden View Missionary Baptist Church parking lot. Deputy Corn agreed that Defendant was cooperative, made no attempts to evade or flee, and provided his information. He confirmed that he asked Defendant if there was someone who would be available to retrieve his vehicle and that Defendant provided the name of a friend who Defendant stated was at a hotel in Carrollville. Deputy Corn stated he was not sure how far Carrollville was from the church, and he did not remember the name of the friend. He confirmed that he used multiple cell phones to attempt to contact this friend, first using Defendant's phone and then utilizing his department-issued phone. Deputy Corn stated he

was not sure whether the General Order allowed the arrested individual to park the vehicle if no one was available to retrieve it.

Defense counsel showed the General Order [Doc. 29-2] to Deputy Corn and asked him to read section five, subsection A(2), which he agreed provides that the officer may park the vehicle of an arrested person for them. He agreed that the stop occurred in the church parking lot. Deputy Corn agreed that another provision allows the arrested person to call a towing service of their choice so long as the service is located within thirty minutes of the location of the stop. He testified that he did not recall how long the stop took but it was more than ten minutes. Deputy Corn confirmed that subsection B of the General Order specifies when not to follow the arrestee's wishes, including when the driver refuses to or is unable to sign a release of liability. Deputy Corn testified that he did not question Defendant's competence and that Defendant was willing to make arrangements and was cooperative during this process.

Deputy Corn testified that a tow-truck was called. He said he did not have a search warrant and that he did not ask for Defendant's consent to go through the vehicle. Deputy Corn confirmed that per ACSO's policy, he must fill out an inventory search form to document what was found but testified that the form did not require a description of where the item was found. Deputy Corn stated he did not fill out an inventory search form at the scene, but that another officer on the scene did. He stated that he believed the officer on the scene who filled out the form was Officer Allen McFalls.

Deputy Corn testified that after the arrest, he filled out a police report and confirmed that he did not alter it at all. In the report, Deputy Corn wrote that he found "a large amount of cash, multiple phones, new tools, and what appeared to be a large amount Methamphetamine" [Doc. 29-1 p. 2]. Deputy Corn confirmed that he did not take photographs of things as he found them.

Deputy Corn testified that the cash was loose throughout the vehicle. He said he could not recall the exact number of phones or where they were located. He stated that the tools were all located in the back of the truck and that they consisted of an assortment of hand tools, as well as possible power tools. As for the methamphetamine, Deputy Corn testified that it was in a pillowcase, in the backseat, on top of some suitcases. Deputy Corn stated that there were multiple suitcases in the backseat.

Defendant showed Deputy Corn a photograph of the back of the car.[3] Deputy Corn agreed it was a fair depiction of what the vehicle looked like when he encountered it. He testified that during the inventory search, he did not enter the suitcase and neither did Deputy McFall. When asked whether he recalled if Deputy McFall asked Defendant what the combination to the suitcase might have been, he stated he thinks he might have. Deputy Corn stated that he did not complete a full inventory of the vehicle and that when he took Defendant to the jail, Deputy McFall remained on the scene.

Deputy Corn agreed he found the methamphetamine inside a pillowcase. Deputy Corn stated that he could not recall the color of the pillowcase. Defendant showed a second photograph and asked Deputy Corn if the burgundy red color looked familiar.[4] Deputy Corn testified that he could not recall.

Defendant introduced an audio recording of an eight-minute dispatch call [Def. Exh. 1]. Deputy Corn confirmed that by 1:48 minutes in the dispatch call, he was aware that Defendant had an extraditable warrant from Arkansas [Exh. 1]. At 4:14 minutes, Deputy Corn agreed the

---

[3]     Defendant did not move this photograph into evidence [*See* Doc. 32].

[4]     Defendant did not move this photograph into evidence [*See* Doc. 32].

7

dispatcher confirmed that a tow-truck was in route [*Id.*]. Deputy Corn testified that at approximately 5:58 minutes, Deputy McFalls radioed that narcotics were found [*Id.*]. He testified that at 7:49 minutes, he informed dispatch that he was on route to the detention facility [*Id.*].

On redirect examination, Deputy Corn testified that the drive to the detention facility lasted approximately twenty-five minutes and agreed that this recording did not accurately account for the amount of time that transpired. He stated that it took a fairly long time for dispatch to get the warrant back and that the audio exhibit did not properly reflect the total amount of time of the traffic stop.

Deputy Corn testified that when he arrested Defendant, he gave Defendant an opportunity to make arrangements for his vehicle. He said he did not believe it was possible for Defendant to make arrangements for the vehicle within the thirty-minute time frame of the policy, as the phone did not work. Deputy Corn testified that he believed it was appropriate to tow the vehicle based on the location of the vehicle at the time of the stop.

Defendant presented no proof at the hearing.

## II. POST-HEARING BRIEFING

At the hearing, Defendant argued his Fourth Amendment rights were violated by an unlawful search of his vehicle. The Court sought clarification about what Defendant sought to suppress in light of the evidence presented. Defendant asserted that he sought to suppress the methamphetamine found in a pillowcase inside a suitcase. He also informed the Court that when officers executed the search warrant months later, officers took a photo that shows a pillowcase inside a black suitcase. The Government maintained that the evidence presented at the hearing from Deputy Corn showed that the methamphetamine was in a pillowcase, which was not in a suitcase, and that Deputy Corn followed the inventory policy.

The Court then ordered the parties to file post-hearing briefs in lieu of oral argument. Defendant filed his post-hearing brief [Doc. 33], and the Government responded [Doc. 34].

Defendant summarizes the testimony from the hearing as follows:

On December 13, 2024, Mr. Patrick Hebert was seized by the Anderson County Sheriff's Office (herein after referred to as "ACSO") following a traffic stop near 2803 Briceville Highway, Briceville, Tennessee. Deputy Corn, with ACSO, effectuated a stop on a red Ford F-150, after witnessing the vehicle allegedly committing a minor traffic infraction for crossing the center line. Mr. Hebert lawfully pulled over and was encountered by Deputy Corn outside of Walden View Missionary Baptist Church. The interaction between Mr. Hebert and ACSO deputies was not captured by either body-worn or dash camera footage. Deputy Corn learned through NCIC that Mr. Hebert had an extraditable parole violation out of Arkansas. Mr. Hebert was removed from his truck, placed in handcuffs, his person searched, and was escorted away from his vehicle. Deputy McFalls responded to the scene to assist Deputy Corn.

Deputy Corn offered Mr. Hebert an opportunity to place a call to a licensed driver to recover the F-150. However, due to cellular service constraints and in violation of the ACSO General Order, the Deputy Corn then dispatched Top Notch Towing, to remove the vehicle from the scene. Without a warrant, and in violation of the Anderson County Sheriff's Office General Order, Deputy Corn and Deputy McFalls entered into the passenger compartment of the truck. (*See* Doc. 29-2). In the rear passenger compartment, there was a black hardcase suitcase with a numeric lock. At the time Mr. Hebert was pulled over, the suitcase's lock was engaged— thereby making the contents of the suitcase unreachable. Deputy Corn testified at the suppression hearing that he may have heard Deputy McFalls inquire what the code to the numeric lock of the suitcase was. The Court, however, did not hear from Deputy McFalls.

After he was identified, arrested and searched, officers opened and then searched the locked suitcase and the passenger compartment of the vehicle. Deputy Corn testified at the suppression hearing that he located a mason jar inside of a zipped pillowcase. Approximately five ounces of suspected methamphetamine was discovered. At the suppression hearing, Deputy Corn was shown a photograph of a red pillowcase inside of the opened suitcase. US currency in the amount of $15,060 was likewise recovered. Of note,

9

> Deputy Corn's report is devoid of information regarding the location of any of the confiscated items. In addition, Deputy Corn did not submit an Inventory Form, per policy, detailing the items seized. (*See* Doc. 29-2). Mr. Hebert was arrested and charged with narcotics. Nearly seven months later, on July 1, 2025, in an attempt to remedy the unlawful search, agents sought a Search Warrant for the Ford F-150. On July 16, 2025, Mr. Hebert was indicted in this Court and charged with possession with intent to sell methamphetamine.

[Doc. 33 pp. 1–2 (footnote omitted)].

Defendant argues he had a legitimate expectation of privacy in his vehicle and his suitcase [*Id*. at 5]. He says he could not access his suitcase or the passenger compartment of his vehicle at the time it was searched because he was in handcuffs and separated from the truck and suitcase by at least two officers [*Id.*]. According to Defendant, therefore, the officers could not search the truck or suitcase incident to his arrest [*Id.*]. Defendant further argues that law enforcement did not follow their inventory procedure, as evidenced by Deputy Corn's "slight report and complete lack of an inventory receipt/form for the items discovered by law enforcement" [*Id.* at 6]. He asserts that the deputies did not allow him to request that his vehicle be locked and left in the Walden View Baptist Church's parking lot nor did they allow him to select a wrecker service of his own choosing [*Id.*]. Accordingly, he claims, the evidence seized was the result of "'suspicion of criminal activity' because of the loose U.S. currency seen in plain view of the vehicle" [*Id.*]. And assuming the pillowcase was outside the suitcase, Defendant argues the "initial unzipping of the pillowcase by Deputy Corn was done without discussion among the officers and any consideration of any ACSO inventorying policy" [*Id.* at 7]. He maintains that the "initial unzipping occurred when [he] was handcuffed in the back of a police car which had bars on its windows" [*Id.*]. Finally, Defendant argues the good faith exception does not apply [*Id.*]. Defendant asks in his post-hearing brief that the Court suppress "the methamphetamine located on December 13, 2024" [*Id.*].

10

The Government responded, relying on its initial response and the evidence presented at the evidentiary hearing [Doc. 34]. In summary, the Government maintains that Deputy Corn conducted a lawful traffic stop and then a records check revealed Defendant had an outstanding warrant for his arrest [*Id.* at 1]. Deputy Corn took Defendant into custody and, pursuant to ACSO policy, "provided [Defendant] with an opportunity to make arrangements for his vehicle; however, [Defendant] was unable to contact anyone to take possession of the vehicle" [*Id.*]. Deputy Corn requested a tow truck and during the inventory search, he found a pillowcase containing a Mason jar of methamphetamine [*Id.*]. The Government submits that the pillowcase was not in a locked suitcase [*Id.*]. Deputy Corn then contacted investigators with the drug task force to take possession of the methamphetamine [*Id.*].

Following submission of the post-hearing briefs, the undersigned took the matter under advisement.

## III.    FACTUAL FINDINGS[5]

On December 12, 2024, Deputy Corn saw a vehicle cross over the center line and drive in the middle of the road on Briceville Highway and conducted a traffic stop. Defendant pulled into the parking lot of Walden View Baptist Church. Deputy Corn approached the vehicle and asked for Defendant's driver's license, which he did not provide. Defendant, however, provided his name. Deputy Corn saw that Defendant's truck was in disarray and that there was cash spread throughout the vehicle. Deputy Corn gave Defendant's name to dispatch and the dispatcher

---

[5]    These factual findings are based on the testimony of Deputy Corn and documents filed in the record. Defendant notes that Deputy McFalls did not testify [Doc. 22 p. 2]. Yet, Defendant did not call Deputy McFalls to testify at the evidentiary hearing or present any other evidence. Even so, nothing suggests that testimony from Deputy McFalls would alter the recommendation herein that when Deputy Corn found methamphetamine and cash he was conducting a lawful inventory search.

informed him that Defendant had an extraditable warrant out of Arkansas. Deputy Corn placed Defendant under arrest, handcuffed him, and placed him in the backseat of his cruiser.

While Defendant was in the cruiser's backseat and pursuant to Defendant's wishes, Deputy Corn attempted to contact an individual to come to the scene and pick up Defendant's vehicle. The individual was a friend whom Defendant stated was in a hotel in Carrollville. Deputy Corn first attempted to call the friend using Defendant's phone, and when that was unsuccessful, Deputy Corn called the individual on his phone. All attempts to reach the friend were unsuccessful, as the cellular service in the area was poor. Because he did not have reason to believe someone could retrieve the vehicle in thirty minutes and because the vehicle was parked in the Walden View Baptist Church parking lot, Deputy Corn then called a tow-truck to collect Defendant's vehicle and began an inventory search of the vehicle. During the inventory search, Deputy Corn found cash, multiple phones, and tools. He also found pillowcases. He felt a hard object inside one.[6] Deputy Corn removed the object and found methamphetamine in a Mason jar.[7] Deputy Corn called the Seventh Judicial Task Force to complete the inventory search and left the scene to drive Defendant to jail.

---

[6] Defendant states in his Supplemental Brief that "Deputy Corn testified at the suppression hearing that he located a mason jar inside of a zipped pillowcase" [Doc. 33 p. 2]. Nothing in the record, however, indicates or suggests that the pillowcase was "zipped" or locked in any way.

[7] In his motion, Defendant submits that "five ounces of suspected methamphetamine and $15,060 in US currency was discovered" inside a "locked suitcase" [Doc. 22 p. 2]. After review of the testimony and evidence at the hearing, the undersigned finds the evidence does not support a finding that the methamphetamine and the cash were found in a locked suitcase, but rather that the cash was located throughout the vehicle and that the methamphetamine was found inside of a pillowcase, which was not inside a locked suitcase.

12

## IV.   ANALYSIS

To begin with, Defendant does not assert that the traffic stop was unlawful. Nor does Defendant challenge the July 2025 search of the vehicle pursuant to a search warrant [Doc. 29-6]. Rather, Defendant purports to challenge the warrantless seizure of methamphetamine from the vehicle, although it is somewhat unclear whether Defendant seeks to suppress the contents of a suitcase or the methamphetamine found on the date of the traffic stop. Either way, Defendant's arguments lack merit. There was no Fourth Amendment violation.

The Fourth Amendment protects citizens from unreasonable searches or seizures. U.S. Const. amend IV. "An inventory search is a recognized exception to the Fourth Amendment's warrant requirement: where the police are in lawful custody of a vehicle, they may conduct an inventory search to catalogue its contents pursuant to standardized criteria." *United States v. Alexander*, 954 F.3d 910, 915 (6th Cir. 2020) (citations omitted). The purpose of an inventory search is to affirm the vehicle contains no harmful items, to secure items of value, and to protect the impounding law enforcement agency against false claims that items have been lost or damaged. *United States v. Snoddy*, 976 F.3d 630, 633–34 (6th Cir. 2020) (citing *Whren v. United States*, 517 U.S. 806, 811 n.1 (1996)). An inventory search is valid if law enforcement has lawful custody of a vehicle, *United States v. Smith*, 510 F.3d 641, 651 (6th Cir. 2007) (citation omitted), and acts according to a defined policy, which need not be written, *Alexander*, 954 F.3d at 915.

"Officers exercising their discretion to impound a vehicle must do so 'according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.'" *Snoddy*, 976 F.3d at 634 (quoting *United States v. Jackson*, 682 F.3d 448, 454 (6th Cir. 2012)). Inventory searches are valid to the extent that officers follow a "'standardized

13

criteria . . . or established routine' to assure that inventory searches are not a 'ruse for general rummaging in order to discover incriminating evidence.'" *United States v. Hockenberry*, 730 F.3d 645, 659 (6th Cir. 2013) (omission in original) (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990)). In other words, an inventory search must be executed pursuant to routine law enforcement procedures and may not be performed for the purpose of investigation. *Snoddy*, 976 F.3d at 634; *Alexander*, 954 F.3d at 916. The Government has the burden of demonstrating by a preponderance of the evidence that the inventory search was conducted pursuant to criteria in the policy. *United States v. Richards*, 147 F. Supp. 2d 786, 789 (E.D. Mich. 2001) (observing that "the Government has the burden of showing that any inventory search was conducted pursuant to standard procedures"), *aff'd*, 56 F. App'x 667 (6th Cir. 2003).

ACSO's General Order on Impoundment and Towing [Doc. 29-2] states an arrested driver has three options for the custody and safe keeping of their vehicle, "depending on the location and circumstances of the arrest" [*Id.* at 2]. The first option is to "contact a licensed driver to come to the scene and take possession of the vehicle, if they can arrive within thirty (30) minutes" [*Id.*]. The second option is to "[r]equest that the member park and lock the vehicle, without inventory, in a nearby legal parking area (provided that it will not obstruct traffic or endanger the public)" [*Id.*]. The final option is for the arrested driver to "[c]all a wrecker service of their choice to tow the vehicle to a location they choose, provided that the wrecker service is located within Anderson County and will be able to arrive at the scene within thirty (30) minutes" [*Id.*]. The policy also provides that "[w]hen the owner/driver is available, the member should not request a wrecker until the owner/driver has been given the opportunity to make their own arrangements for removing the vehicle" [*Id.*].

14

Here, Deputy Corn and Defendant attempted to contact another individual to take possession of the vehicle, at least two times, but were ultimately unsuccessful, in part due to poor service. Deputy Corn stated that he did not believe Defendant would be able to make any other arrangements within the General Order's allotted timeframe of thirty minutes again due to bad phone reception. And Deputy Corn explained that, based on the location of where the vehicle was parked, he believed it was appropriate to tow the vehicle.

Defendant contends that the officers failed to follow the inventory procedure because they did not allow him to request that his vehicle be locked in the Walden View Baptist Church's parking lot nor did they allow him to select a wrecker service of his own choosing [Doc. 33 p. 6]. The undersigned finds, however, "that an impoundment decision will not be impermissible simply because alternatives to impoundment might exist." *United States v. Smith*, No. 3:19-CR-22, 2022 WL 14742777, at * 11 (E.D. Tenn. Sept. 16, 2022) (citations omitted) (finding unavailing the defendant's argument that "seems to center on the fact that the LCPD Policy provided alternatives to impoundment that were not afforded to Defendant"), *report and recommendation adopted*, No. 3:19-CR-22, 2022 WL 14808944 (E.D. Tenn. Oct. 25, 2022); *see also United States v. Kimes*, 246 F.3d 800, 805 (6th Cir. 2001) (holding that officers were not required to "take[] it upon themselves to call [the defendant's] wife and ask her to get the vehicle"); *cf. United States v. Agofsky*, 20 F.3d 866, 873 (8th Cir. 1994) ("Nothing in the Fourth Amendment requires a police department to allow an arrested person to arrange for another person to pick up his car to avoid impoundment and inventory.").

Defendant submits that Deputy Corn failed to follow the specific inventory procedure, and that this is "evidenced by the Deputy's slight report and complete lack of an inventory receipt/form for the items discovered by law enforcement" [Doc. 33 p. 6]. Deputy Corn's report states that while

15

conducting "an inventory search of the vehicle," he discovered "a large amount of cash, multiple phones, new tools, and what appeared to be a large amount of Methamphetamine" [Doc. 29-1 p. 2]. Deputy Corn testified that his report was short but he maintained that everything in it was true and accurate.

Further, while Defendant highlights the lack of an inventory receipt, Deputy Corn testified that once the methamphetamine was found, he paused the inventory search and called the Seventh Judicial Task Force, which took custody of the vehicle and its contents. The Seventh Judicial Task Force's narrative reflects that Defendant "was found to be in possession of approximately 5 ounces (147 grams) of methamphetamine and $15,600 in US Currency during an inventory search" [Doc. 29-4 p. 4]. It further states that "[t]he US Currency and the 2024 Ford F150 were both seized by the 7th Judicial Crime Task Force" and that "[Defendant] was given his copy of the notice of seizure" [*Id.*]. The Court finds this sufficiently addresses the lack of inventory report, as ACSO did not take the vehicle and its contents into custody due to the Seventh Judicial Task Force's intervention in the matter.

Upon review of the record, and the relevant law, the undersigned finds the Government has shown by a preponderance of the evidence that Deputy Corn complied with ACSO's inventory policy, "which provides for lawful seizure and impoundment of a vehicle upon an arrest and requires an inventory of all property in the vehicle." *Smith*, 2022 WL 14742777, at *11 (footnote omitted).

Yet, Defendant further argues that "the reason for the search was discovering illegality" [Doc. 33 p. 6]. In support of his contention, Defendant points to the testimony of Deputy Corn, which "established that he knew there was a large amount of U.S. currency in the vehicle"

[*Id.* at 7]. Defendant advances that "[i]t is with the knowledge that money was within the truck that officers discussed whether they could search the vehicle in its entirety" [*Id.*].

An officer's "[d]iscretion as to impoundment is permissible 'so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.'" *Jackson*, 682 F.3d at 454 (quoting *Colorado v. Bertine*, 479 U.S. 367, 375–76 (1987)). An officer's suspicions that he may locate contraband do not invalidate an inventory search that is otherwise proper. *Alexander*, 954 F.3d at 915 (citing *Lumpkin*, 159 F.3d at 987).

While Defendant contends "[t]he seized evidence was found as a result of 'suspicion of criminal activity' because of the loose U.S. currency seen in plain view of the vehicle" [Doc. 33 p. 6], Deputy Corn's testimony indicates that he was following ACSO's inventory policy and was not investigating a crime. Deputy Corn testified that before he called a tow truck or began the inventory of the vehicle's contents, he permitted Defendant to try to contact a friend to retrieve the vehicle. He said after he contacted the tow truck, he began the inventory. Deputy Corn testified that when he began inventorying the vehicle, he was not investigating a crime and was only conducting inventory. Deputy Corn explained that the reason for inventory searches was to prevent things from being stolen and to protect items inside the vehicle. That Deputy Corn saw cash in the vehicle does not support finding that the underlying intent behind the inventory search was to investigate a crime. Under the circumstances and record in this case, the Court cannot conclude that Deputy Corn acted in bad faith or for the sole purpose of investigation.[8]

---

[8]     Defendant argues the good faith exception does not apply [Doc. 33 p. 7]. The Government does not rely on this exception, so the undersigned does not address it.

17

## V. CONCLUSION

For the reasons explained herein, the undersigned respectfully **RECOMMENDS**[9] that the District Judge **DENY** Defendant Patrick Hebert's Motion to Suppress [**Doc. 22**].

Respectfully submitted,

Jill E. McCook
United States Magistrate Judge

---

[9] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Tchrs*, 829 F.2d 1370, 1373 (6th Cir. 1987).

18